2000 UT 41

STATE of Utah, Plaintiff and Appellee,

v.

Allan KELLEY, Defendant and Appellant.

No. 981798.

Supreme Court of Utah.

May 2, 2000.

Jan Graham, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, and Sandra L. Sjogren, Ogden, for plaintiff.

Geoffrey L. Clark, Ogden, for defendant.

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 Defendant Allan Kelley appeals from a conviction by a jury of attempted rape, a first degree felony.[1] He raises two issues on appeal: first, whether the trial court abused its discretion in qualifying the prosecution's expert witness and allowing him to state conclusions founded upon alleged impermissible bases, and second, in the alternative, whether defense counsel's failure to timely object to the qualifications of the expert or raise an objection to the principles that the expert relied upon constituted ineffective assistance of counsel.

---

1. Rape is defined by Utah Code Ann. § 76–5–402 (1999), and attempt by section 76–4–101. Attempted rape is a first degree felony pursuant to section 76–4–102(2).

## BACKGROUND

¶ 2 In reviewing a jury verdict, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the verdict. *See State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237; *State v. Brown*, 948 P.2d 337, 339 (Utah 1997). We recite the facts accordingly.

¶ 3 The victim is a mentally disabled, thirty-seven-year-old woman. Normally, she lives at Medallion Manor, an intermediate care facility for disabled individuals. She is incapable of living alone and needs assistance with simple daily tasks. At the time of trial, she was being taught basic bathing and grooming skills, and how to make her bed.

¶ 4 In December of 1997, the victim was staying with her brother in their childhood home over the Christmas holiday. Defendant Allan Kelley was also living in the home with the victim's brother. Defendant grew up in a house down the street from the victim and had known her family for over thirty years. He had married and moved away from the neighborhood years before but, due to marital problems, returned to stay with the victim's brother for three months in 1996, and again five months prior to the incident in this case in 1997.

¶ 5 On December 26, the brother left early in the morning for work, and the victim was alone at the house for a few hours until her sister could pick her up. At approximately 8:35 a.m., defendant returned to the house after spending the night with his estranged wife. Alone with the victim, defendant undressed himself and began to fondle her over her nightgown. He then partially undressed her, continued to fondle her breast and genital area, and eventually attempted to initiate sexual intercourse.

¶ 6 The sister came to pick the victim up sometime between 8:30 and 9:00 a.m. With her own key, she entered the home and found the victim lying on her back on the floor, naked from the waist down. She then saw defendant, completely naked, run out of the room and into his bedroom. She immedi-

ately helped the victim get dressed and helped her into her car. The victim was frightened and kept repeating what had happened. The sister drove to the home of another brother where they called the police. The Weber County prosecutor charged defendant with rape, a first degree felony pursuant to Utah Code Ann. § 76–5–402 (1999).

¶ 7 At trial, the jury was instructed on, and presented evidence by the parties as to, both the offense of rape and the lesser included offense of attempted rape. Defendant argued in his defense that although he did attempt to initiate sexual intercourse, the victim appeared to consent to and even encourage his sexual advances. He did, however, testify that he knew she was "mentally retarded to some extent," that she could not speak clearly, and that she could not work or live by herself. The State argued that the victim, because of her mental disability, could not consent to or comprehend defendant's sexual advances as recognized by Utah Code Ann. § 76–5–406 (1999), which provides:

> An act of ... attempted rape ... is without consent of the victim under any of the following circumstances:
>
> . . . .
>
> (6) the actor knows that as a result of mental disease or defect, the victim is at the time of the act incapable either of appraising the nature of the act or of resisting it;
>
> . . . .

¶ 8 Four months before trial, the prosecutor gave defendant notice that she intended to call Ronald J. Wright, a mental retardation professional ("MRP")[2] and director of the victim's residential home, as an expert witness. Wright was to testify as to the victim's mental capabilities and ability to appraise the nature of a sexual relationship. Defense counsel failed to file any objection until four days prior to trial. At trial, the judge heard oral arguments on the objection and ruled that if the prosecution could lay the proper foundation, Wright could testify as an expert.

---

2. Though the term "disabled" is now regarded as more appropriate, we use "retarded" where

Wright specifically did so in his testimony.

¶ 9 Wright testified that although the victim had the physical body of an adult, she did not have the mental capacity to consent to, or understand the consequences of, a sexual act. In making this determination, Wright testified that he based his opinion on an intelligence quotient test ("I.Q.test"), a mental age assessment, his training as an MRP, his twenty-seven years of experience as a special education teacher, his fifteen years of experience as program director of the victim's residential facility, and his personal experience with her. At the close of trial, defendant was found guilty of attempted rape and sentenced to serve a term of three years to life.

### ANALYSIS

¶ 10 Defendant appeals from his conviction on two alternate theories. First, he contends that Wright was not qualified to testify as an expert witness as to the victim's ability to consent and that the sources upon which he relied in forming his opinion were impermissible bases for his testimony. In the alternative, defendant argues that his trial counsel's failure to timely and adequately object to Wright's expert testimony constituted ineffective assistance of counsel.

### I. ADMISSIBILITY OF EXPERT TESTIMONY

#### A. Qualification of Wright as Expert Witness

■ ¶ 11 Defendant first argues that Wright was not qualified to testify as an expert regarding the victim's mental capabilities because he was not qualified to diagnose mental retardation, give I.Q. tests, or make mental age assessments. It is well established that trial courts have wide discretion in determining the admissibility of expert testimony. *See Patey v. Lainhart,* 1999 UT 31, ¶ 15, 977 P.2d 1193; *State v. Larsen,* 865 P.2d 1355, 1361 (Utah 1993); *Randle v. Allen,* 862 P.2d 1329, 1337 (Utah 1993); *State v. Shickles,* 760 P.2d 291, 302 (Utah 1988); *State v. Espinoza,* 723 P.2d 420, 421 (Utah 1986). Consequently, absent a clear abuse of this discretion, an appellate court will not reverse the trial court's determination. *See Larsen,* 865 P.2d at 1361.

¶ 12 The standard for the admissibility of expert testimony is set forth in Utah Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"The critical factor in determining the competency of an expert is whether that expert has knowledge that can assist the trier of fact in resolving the issues before it." *Patey,* 1999 UT at ¶ 15, 977 P.2d 1193; *see also Larsen,* 865 P.2d at 1361; *Wessel v. Erickson Landscaping Co.,* 711 P.2d 250, 253 (Utah 1985).

■ ¶ 13 We hold that the trial court did not abuse its discretion in determining that Wright was qualified to testify. He had specialized knowledge that aided the trier of fact in determining whether the victim had sufficient mental ability to appraise the nature of a sexual act. Wright has a degree in special education from Brigham Young University and had been a special education teacher for twenty-seven years at the time of trial, working at a local high school as well as at Medallion Manor. At Medallion Manor, Wright is an MRP and program director, which entails making determinations about the effect of mental disabilities on the cognitive functions of disabled individuals and then creating and tailoring programs to teach basic behaviors and activities. He uses the recommendations of a team of experts such as psychologists, psychiatrists, and medical doctors to determine the intellectual and physical abilities of the individuals with whom he works. Wright testified that during his fifteen years as an MRP at Medallion Manor, he had worked closely with forty to fifty people with the same level of mental disability as the victim. At the time of trial, he had been working daily with her for over two years. He was able to detail what she was capable of accomplishing. He also testified specifically as to her understanding of sexual concepts, as she had been enrolled in a sexual relations class at Medallion Manor

and was removed when she was unable to grasp the concepts being taught.

¶ 14 Defendant argues that because Wright was not licensed to diagnose mental retardation, he was not qualified to testify as to the victim's cognitive abilities. However, licensing in and of itself is not dispositive of an expert's qualifications to offer an opinion. *See Randle,* 862 P.2d at 1337. Defendant also contends that Wright was not qualified to administer an I.Q. test or make a mental age assessment, and consequently should not have been allowed to testify as an expert. At trial, Wright did testify that he was in fact qualified to administer an I.Q. test, even though he did not administer the test to the victim. We do not, however, find this issue determinative as to whether Wright can testify. He was not called to testify as to her I.Q. or mental age, but as to her overall ability to consent to a sexual relationship. "A person may be qualified to testify as an expert by virtue of experience and training; formal education is not necessarily required." *Patey,* 1999 UT at ¶ 15, 977 P.2d 1193; *see also Randle,* 862 P.2d at 1337; *State v. Eldredge,* 773 P.2d 29, 37 (Utah 1989).

¶ 15 Wright's training and experience were sufficient for the trial court to have found him qualified to give expert testimony on the victim's competency. We have routinely allowed persons to testify as experts based on the totality of their qualifications and experience, and not on licensing or formal standards alone. *Cf. Espinoza,* 723 P.2d at 421 (determining that police officer with four to five years as a drug seller and user prior to becoming an officer, and several years as an investigator was qualified to give expert testimony as to the current drug culture); *State v. Locke,* 688 P.2d 464, 464–65 (Utah 1984) (holding that qualifying a police officer with five years of experience and additional training as an expert was not an abuse of discretion by the trial court); *State v. Clayton,* 646 P.2d 723, 727 (Utah 1982) (qualifying witness with twelve years of experience in the area of inquiry).

¶ 16 Not only was it Wright's occupation to determine the cognitive abilities of disabled individuals, it was his responsibility to determine the cognitive abilities of the victim. We will not second-guess the trial court when there is no evidence of any abuse of discretion.

### B. Admissibility of I.Q. Test/Mental Age Assessment

¶ 17 Defendant next contends that Wright's testimony was inadmissible because the I.Q. test and mental age assessment upon which Wright relied in forming his opinion do not meet the inherent reliability requirement as set forth in *State v. Rimmasch,* 775 P.2d 388 (Utah 1989). We conclude that defendant's reliance on *Rimmasch* is mistaken.

¶ 18 Initially, it is important to note that Wright did not attempt to submit these assessments into evidence, but relied on them solely as two of many bases for his conclusions. "Much of what experts rely upon in formulating opinions is inadmissible evidence. However, experts are called into court to give their expert opinions, and they must be allowed to explain the foundation for that opinion." *Patey v. Lainhart,* 1999 UT 31, ¶ 33, 977 P.2d 1193; *see also United States v. Farley,* 992 F.2d 1122, 1125 (10th Cir.1993); *Hickok v. G.D. Searle & Co.,* 496 F.2d 444, 447 (10th Cir.1974). Thus, our inquiry is not whether the I.Q. test and mental age assessment were themselves admissible evidence, but whether Wright could properly use these tests along with other factors in making his ultimate conclusions as to the victim's ability to comprehend a sexual relationship. The admission of expert testimony is governed by Utah Rule of Evidence 703, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Defendant argues that the inherent reliability standard set forth in *Rimmasch* in conjunction with rule 703 is the appropriate measure of whether Wright could properly rely upon these mental assessments in forming his opinion. We disagree.

¶ 19 We held in *Rimmasch* that while rule 703 is the general rule for the admission of all expert testimony, where expert testimony is based upon *novel* scientific principles or techniques, courts should apply the inherent reliability standard. *See Rimmasch*, 775 P.2d at 396. Here, there is no plausible claim that the type of expert testimony offered by the prosecution was based on novel scientific principles or techniques. In fact, our case law recognizes a long history of using I.Q. tests, *see, e.g., State v. Dutchie*, 969 P.2d 422, 428 (Utah 1998) (I.Q.testing); *Gardner v. Holden*, 888 P.2d 608, 612 (Utah 1994) (I.Q.testing); *State v. Mabe*, 864 P.2d 890, 891 (Utah 1993) (I.Q.testing); *State ex rel. Winger v. Davis*, 558 P.2d 1311, 1314 (Utah 1976) (I.Q.testing); *State ex rel. Mario A.*, 30 Utah 2d 131, 134, 514 P.2d 797, 799 (1973) (I.Q.testing); *State ex rel. Pilling v. Lance*, 23 Utah 2d 407, 411, 464 P.2d 395, 397 (1970) (I.Q.testing), and mental age assessments, *see, e.g., State v. Hallett*, 856 P.2d 1060, 1063 (Utah 1993) (mental age assessment); *State v. Murphy*, 760 P.2d 280, 281 (Utah 1988) (mental age assessment). Thus, reliance on *Rimmasch* is misplaced.

¶ 20 The appropriate standard is set forth in *State v. Clayton*, 646 P.2d 723 (Utah 1982):

[O]nce the expert is qualified by the court, the witness may base his opinion on reports, writings or observations not in evidence which were made or compiled by others, so long as they are *of a type reasonably relied upon by experts in that particular field.* The opposing party may challenge the suitability or reliability of such materials on cross-examination, but such challenge goes to the weight to be given the testimony, not to its admissibility.

*Id.* at 726 (emphasis added); *see also Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 839 (Utah 1984). The inquiry, then, is whether there was evidence supporting the trial court's ruling that these types of tests are of the sort experts in Wright's field reasonably and regularly rely upon.

¶ 21 As an MRP, special education teacher, and director of Medallion Manor, Wright writes and implements programs individually tailored to disabled individuals to help them achieve their full potential. In doing so, he uses the evaluations of social workers, psychologists, doctors, and psychiatrists in tailoring a program that best meets the capabilities and needs of the individual client. Wright specifically stated that he regularly uses standardized I.Q. tests and mental age assessments made by psychologists as a factor in determining what each individual is capable of achieving and how to best meet those educational goals. Such testing is necessary for MRPs in writing their programs and is required of facilities such as Medallion Manor to meet their licensing mandates.

¶ 22 Defendant has offered no evidence to contradict the common usage of such tests by MRPs, and as mentioned above, our case law demonstrates the opposite—that use of such tests by experts testifying as to the mental capabilities of disabled individuals is reasonable and regular.

¶ 23 Defendant also argues that the I.Q. test and mental age assessment were impermissible bases of opinion because Wright did not conduct the testing himself. Yet Utah Rule of Evidence 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Rule 703 clearly permits expert opinion to be based on information "made known" to the expert, not only on information perceived by the expert. For example, in *Gardner v. Holden*, 888 P.2d 608 (Utah 1994), testimony given by an expert as to the defendant's judgment or ability to reason that was based on a number of psychological and medical records, none of which were performed by the expert, was admissible. *See id.* at 618–19. Thus, under our case law, it is not necessary for experts to have perceived all aspects of their testimony personally.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 24 In the alternative, defendant argues that he was denied his right to effective assistance of counsel when his trial attorney failed to timely file an objection to Wright's

expert testimony and then failed to make a similar challenge at trial. Defendant asserts that absent these errors, he would have received a more favorable outcome at trial. We disagree.

¶ 25 In considering ineffectiveness claims, we consistently apply the test articulated by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* a defendant raising an ineffectiveness claim must show " 'first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant.' " *Parsons v. Barnes,* 871 P.2d 516, 521 (Utah 1994) (quoting *Bundy v. Deland,* 763 P.2d 803, 805 (Utah 1988)); *see also State v. Maestas,* 1999 UT 32, ¶ 20, 984 P.2d 376; *State v. Arguelles,* 921 P.2d 439, 441 (Utah 1996). To establish prejudice, defendant must show " 'a reasonable probability ... that except for ineffective counsel, the result would have been different.' " *State v. Verde,* 770 P.2d 116, 118 (Utah 1989) (quoting *State v. Lovell,* 758 P.2d 909, 913 (Utah 1988)); *see also State v. Templin,* 805 P.2d 182, 187 (Utah 1990).

¶ 26 Defendant asserts two claims of ineffective assistance of counsel: first, his trial attorney's failure to timely file a motion in limine in opposition to Wright's appearance and testimony, and second, his trial counsel's failure to adequately object to the use of the I.Q. test and mental age assessment of the victim upon which Wright relied in making his conclusions. Because we hold that Wright was adequately qualified as an expert, that his testimony was admissible, and that he properly relied upon the I.Q. test and mental age assessment, defendant fails to meet the requisite showing of prejudice necessary for his claims of ineffective assistance of counsel to succeed. Wright's testimony was properly admitted, and therefore, any objection to it, timely or not, would have been futile. Failure to raise futile objections does not constitute ineffective assistance of counsel. *See Parsons,* 871 P.2d at 525; *Codianna v. Morris,* 660 P.2d 1101, 1109 (Utah 1983). Defendant could not have been prejudiced by properly admitted testimony, so his ineffective assistance of counsel claims fail. *See Arguelles,* 921 P.2d at 441 (holding failure to establish prejudice defeats a claim of ineffective assistance of counsel); *State v. Hay,* 859 P.2d 1, 8 (Utah 1993) (same).

¶ 27 The judgment of the trial court is affirmed.

¶ 28 Associate Chief Justice RUSSON, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Chief Justice HOWE's opinion.