2014 UT App 166

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jeffery A. CHRISTENSEN, Defendant and Appellant.**

**No. 20130351–CA.**

Court of Appeals of Utah.

July 17, 2014.

Judge STEPHEN L. ROTH authored this Opinion, in which Judges JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN concurred.

## Opinion

ROTH, Judge:

¶ 1 Defendant Jeffery A. Christensen was convicted of second degree felony theft and third degree felony criminal mischief for the burglary of a hunting preserve clubhouse in Utah County. Police never recovered any of the stolen property, so the convictions were based largely on circumstantial evidence and the company manager's estimate of the value of property that was stolen or damaged during the burglary. On appeal, Christensen argues that the manager's estimates were so speculative that it was plain error for the court to allow the jury to consider them and ineffective assistance for his trial counsel not to object to the sufficiency of the evidence. He also argues that the prosecutor inappropriately called the jury's attention to facts not in evidence during his closing argument, bolstered the credibility of a witness, and improperly offered his personal opinion of Christensen's guilt. We affirm.

## BACKGROUND [1]

¶ 2 Wasatch Wing & Clay (WWC) is a bird hunting preserve in Utah County located about twelve miles west of Lehi, accessed from SR–73. Brian Beckstead was WWC's manager until March 2012. His duties included managing the company's finances, overseeing routine maintenance throughout the company's property, and tracking its inventory.

¶ 3 On Monday November 14, 2011, Beckstead received a call at 1:30 a.m. from WWC's security company alerting him to a potential burglary at the WWC clubhouse. Because rodents had set off WWC's basement motion detectors in the past, Beckstead told the security company to call him back if it detected any activity on the main floor. One hour later, the security company called again and told Beckstead that movement had

Jennifer K. Gowans–Vandenberg, for Appellant.

Sean D. Reyes and Deborah L. Bulkeley, for Appellee.

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown,* 948 P.2d 337, 339 (Utah 1997).

been detected on the main floor. Beckstead immediately left his home in Saratoga Springs and drove toward the clubhouse. As he approached WWC from the southwest on SR–73, Beckstead saw a vehicle drive south on the dirt road from the clubhouse and then turn northeast on SR–73 toward Lehi. Beckstead called 911 and followed the vehicle. He described the vehicle as a white Chevy pickup truck with a shell and gave the dispatcher its license plate number.

¶ 4 Beckstead eventually stopped following the truck and drove back to WWC to check on the clubhouse. He noticed that a cedar post that supported one of the company's brown-painted access gates had been "sheared off at the base." The gate was damaged and had black paint marks on it, and a window near the clubhouse's main door was also broken. Police arrived and took pictures of "black transfer" paint on the broken gate as well as two tire tracks they found nearby. Police then accompanied Beckstead inside the clubhouse, where he discovered that his computer, monitor, a painting, and several boxes of shirts were missing. The cash drawer, which had held both cash and checks when he closed up the night before, was also empty.

¶ 5 The license plate number Beckstead called in was registered to Jerry Christensen, the father of the Defendant, Jeffery Christensen. Police visited the Christensen home the day of the burglary, but the truck was not there. Christensen's father told police that his son lived in a trailer next to the home but that he was not there because he was out driving the truck.

¶ 6 Police arranged to interview Christensen the next day in his trailer. When they arrived, police noticed that the father's white pickup truck was parked outside and that it had a number of "scrapes and scuffs on [its] black plastic" tire flares. The front bumper was "obviously dented" below the license plate, and there were several "dents and scrapes" on the truck's passenger side. One dent near the bumper had "brown-colored tint paint transfer" that looked "fairly new." Later, police also determined that the tire tracks the investigators found near WWC's

broken gate had "similar pattern characteristics" to the tread on the Christensen truck.

¶ 7 Christensen told police that he was visiting a friend (Friend) in Lehi at the time of the burglary. Friend initially confirmed part of Christensen's story, telling police that Christensen stopped by for a cigarette sometime between 2:30 and 3:30 a.m. on November 14. But she later changed her story to say that Christensen had not visited her home that night and claimed that he had asked her to lie to police. Police never recovered any of the stolen property.

¶ 8 The State charged Christensen with burglary, theft, and criminal mischief. Based on Beckstead's estimate that the property stolen from the clubhouse was worth more than $5,000, the theft was charged as a second degree felony. The criminal mischief was charged as a third degree felony based on estimates that the damage to the window and gate was between $1,500 and $5,000. A jury convicted Christensen of all three counts. Christensen appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Christensen argues that his trial counsel provided ineffective assistance by failing to seek a directed verdict based on insufficient evidence of the value of WWC's damaged and stolen property. He also argues that the estimates were so lacking in foundation that the court erred by submitting them to the jury. Additionally, Christensen argues that the prosecutor made several statements during closing argument that constituted prosecutorial misconduct.

¶ 10 None of the issues Christensen raises on appeal were preserved at trial, so he asks us to review them for ineffective assistance of counsel and plain error. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. To prove ineffective assistance, Christensen must show (1) "that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgment" and (2) "that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case."

*State v. Litherland,* 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "The first prong ... requires that the defendant rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation and internal quotation marks omitted). And "[w]here the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of finding that counsel performed effectively." *Id.* ¶ 17. The failure "to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley,* 2000 UT 41, ¶ 26, 1 P.3d 546.

 ¶ 11 To establish plain error, Christensen must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *See State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993).

 ¶ 12 Finally, Christensen invokes the cumulative error doctrine, arguing that the overall effect of these errors prejudiced his defense. We will reverse a conviction for cumulative error " 'only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had.' " *State v. Wright,* 2013 UT App 142, ¶ 44, 304 P.3d 887 (omission in original) (quoting *Dunn,* 850 P.2d at 1229).

## ANALYSIS

¶ 13 We conclude that Christensen's trial counsel did not provide ineffective assistance for failing to object to Beckstead's estimates and that it was not plain error for the court to allow the jury to consider them. We also conclude that none of the prosecutor's statements during closing argument amounted to misconduct, so Christensen's trial counsel was not ineffective for failing to object and

the trial court did not commit plain error by not intervening.

### I. Estimates of the Value of WWC's Property

¶ 14 Christensen argues that the foundation for Beckstead's estimate of the value of the stolen cash and checks and the damaged gate was so weak that his trial counsel was ineffective for not challenging it and the trial court plainly erred by submitting it to the jury. Absent these errors, Christensen argues, "he would not have been convicted of a third degree felony for criminal mischief" or "of second degree felony theft." Instead, the maximum penalty available would have been a class B misdemeanor for criminal mischief and a third degree felony for theft.

¶ 15 Christensen frames his argument as a challenge to the sufficiency of the evidence, asserting that Beckstead's estimate of the value of the damaged and stolen property lacked foundation, was "speculative," and was "not measurable." But after the estimates were admitted into evidence without objection, the jury had specific value estimates upon which it could rely to support a conviction. *See, e.g., State v. Bingham,* 684 P.2d 43, 47 (Utah 1984) (sustaining a conviction for theft of property worth more than $1,000 where evidence of value "was only roughly estimated"). In essence, then, the alleged error Christensen identifies is not the sufficiency of the evidence to support his convictions; rather, it is whether the value estimates were inadmissible for lack of foundation. Even if Christensen had identified this error correctly, however, we conclude that the estimates were supported by an adequate foundation. Thus, trial counsel's performance was not deficient for failing to object and the trial court did not err by submitting the evidence to the jury.

### A. Second Degree Felony Theft

¶ 16 Theft is a second degree felony if the value of stolen property "is or exceeds $5,000." Utah Code Ann. § 76–6–412(1)(a) (LexisNexis Supp.2013).[2] It is a third degree felony if the stolen property is worth

2. We cite the current version of the Utah Code as a convenience to the reader because subsequent amendments do not affect the sections pertinent to our analysis.

more than "$1,500 but ... less than $5,000." *Id.* § 76–6–412(1)(b). At trial, Beckstead estimated that the items stolen from the WWC clubhouse were worth about $6,675: $1,100 in checks, $3,900 in cash, a $1,100 computer and monitor, a $175 painting, and $400 worth of t-shirts. Christensen concedes that Beckstead's testimony was sufficient to establish the value of the computer, the painting, and the t-shirts, which were collectively worth about $1,675. But he argues that "Beckstead could only guess the values of the stolen cash and checks" because the computer containing the company's financial records had been stolen and Beckstead "had not backed up the hard drive for several weeks prior to the burglary." Christensen contends that his trial counsel should have challenged Beckstead's estimate or that the trial court should have withheld it from the jury on its own accord.

¶ 17 We conclude that trial counsel's failure to challenge the admissibility of the evidence was not deficient performance. Christensen did not object to the admissibility of Beckstead's estimate at trial, nor did he submit any evidence showing that the actual value of the stolen cash and checks was less than $5,000. On appeal, Christensen has also failed to identify any evidence in the record that calls Beckstead's estimate into question. The deferential standard of review that applies to ineffective assistance of counsel claims requires us to presume that trial counsel "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). Consequently, "[w]here the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of finding that counsel performed effectively." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. Without any evidence that Beckstead's estimate was inaccurate, Christensen's ineffective assistance claim is "speculative," not "a demonstrable reality," and must therefore be denied. *See Fernandez v. Cook*, 870 P.2d 870, 877–78 (Utah 1993).

¶ 18 We are also not persuaded that there would have been any merit to a foundation objection had trial counsel raised one, and the "[f]ailure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Beckstead was a fact witness offering lay testimony in the form of an estimate of the value of property stolen and damaged in the course of the crime. Lay testimony is admissible if there is evidence "sufficient to support a finding that the witness has personal knowledge of the matter." Utah R. Evid. 602. Where a lay witness gives an estimate or an opinion, it must be "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." *Id.* R. 701.

¶ 19 After carefully reviewing the trial transcripts and evidence in the record, we are unable to conclude that Beckstead's estimate lacked an adequate evidentiary foundation. Courts routinely allow owners to estimate the value of their property unless it appears that the owner has no "realistic idea of its value." *See Utah State Road Comm'n v. Steele Ranch*, 533 P.2d 888, 891 (Utah 1975). An owner's property manager may do the same provided she is sufficiently familiar with the property's cost and condition. *State v. Purcell*, 711 P.2d 243, 245 (Utah 1985). In *Purcell*, the Utah Supreme Court rejected a sufficiency challenge to a conviction for stealing furniture from an apartment complex even though the only evidence of the furniture's value was an estimate from the apartment manager. *Id.* The court noted that because the apartment manager was "familiar with the cost and condition" of the stolen property, "[h]is situation was sufficiently analogous to that of an owner to permit him to testify regarding the value of the property under his supervision." *Id.*

¶ 20 Here, Beckstead's testimony established that, as the general manager, he was familiar enough with WWC's day-to-day finances to be able to estimate the value of the stolen cash and checks. Beckstead testified that typical weekend earnings for WWC

were $20,000 and that none of the cash or checks from Sunday had been removed from the cash drawer prior to the burglary Monday morning. He also testified that his managerial duties included keeping financial records, managing expenses and income, and handling "all other operations with regard to the business." The State certainly could have strengthened Beckstead's testimony with actual financial records detailing WWC's average revenue for a typical November weekend. But Beckstead's testimony demonstrated that he was familiar enough with the company's finances to estimate how much money was left in the register Monday morning. We therefore cannot conclude that Beckstead's estimate was speculative and not based on his own personal knowledge, so opposing its admission into evidence would have been futile. And for similar reasons, it was also not plain error for the court to allow Beckstead's estimate to be submitted to the jury as evidence. *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993) (noting that plain error requires a defendant to show, among other things, that an error "should have been obvious to the trial court").

### B. Third Degree Felony Criminal Mischief

¶ 21 Criminal mischief is a third degree felony "if the actor's conduct . . . causes pecuniary loss equal to or in excess of $1,500 but is less than $5,000 in value." Utah Code Ann. § 76–6–106(3)(b)(ii) (LexisNexis 2012). If the defendant causes a loss "less than $500 in value," criminal mischief is a class B misdemeanor. *Id.* § 76–6–106(3)(b)(iv). Beck-

stead estimated the replacement cost of the damaged gate at $1,600, and he testified that the broken window cost $280 to replace. On appeal, Christensen argues that Beckstead's estimate of the gate's value was "inconclusive and speculative," based only on his "unspecified 'experience in steel fabrication' for which there was no foundation." Further, he contends, Beckstead was not competent to testify about the value of the gate in the first place because he was a fact witness, not "an expert witness in steel fabrication or in metal gate valuation." We conclude that failing to object to the estimate's foundation was not deficient performance and that the trial court did not commit plain error by allowing the jury to consider it.

¶ 22 As we have discussed, property owners are "competent to testify on the present market value" of their property, and so is a property manager who is sufficiently familiar with "the cost and condition" of his employer's property. *Purcell*, 711 P.2d at 245. Additionally, "[s]imply because a question might be capable of scientific determination, helpful lay testimony touching on the issue and based on personal observation does not become" an inadmissible expert opinion. *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987). Here, Beckstead's duties as manager of WWC were expansive, encompassing financial management, accounting, human resources, and general maintenance throughout the property. He testified that the cost to replace the gate was $1,600, and that while WWC paid someone less than that to make it functional, "the plan was to replace it." [3] He

---

3. Christensen seems to argue that because WWC had not yet replaced the gate, the proper measure of damages is whatever the company paid to repair it, not the full replacement cost that Beckstead estimated. But the criminal mischief statute provides that the value of damaged property is "the measureable cost to replace *or* restore," Utah Code Ann. § 76–6–106(4) (LexisNexis 2012) (emphasis added), and Beckstead's testimony suggested that the repair that had been made to the gate was a temporary one in anticipation of replacement. While the general rule of recovery for damaged property contemplates that the value will be set at the lesser of the cost of repair or replacement, *see Ault v. Dubois*, 739 P.2d 1117, 1120 (Utah Ct.App.1987), that rule applies only where there is evidence that repair can provide an equivalent item at a lesser cost. Christensen has not pointed to any evidence in the record

that replacement was not warranted by the damage Christensen did to the gate, and WWC's plans to replace the gate suggest otherwise. Further, trial counsel may have known there was evidence to support the choice to use the replacement cost, so he did not perform deficiently by failing to challenge it. *See State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92 ("Where the record appears inadequate in any fashion, ambiguities or deficiencies resulting therefrom simply will be construed in favor of finding that counsel performed effectively."). And because there is no clear evidence in the record that using the gate's replacement cost was inappropriate, the trial court had no duty to intervene. *See State v. Powell*, 2007 UT 9, ¶ 43, 154 P.3d 788 (rejecting a plain error claim because "given the paucity" of pertinent information in the record, even if the

also based his estimate on prior experience in "steel fabrication." Although Christensen may be correct that an expert witness or one of the company's owners may have been able to provide more detail about the gate's value or the cost to repair it, that does not mean Beckstead's extensive managerial responsibilities, which he characterized as "all purpose, anywhere ... on the property," were insufficient to acquaint him with the condition and value of the gate.

¶ 23 But even if the record is inconclusive as to whether Beckstead was familiar with the cost of the gate or deficient in establishing his experience in steel fabrication, trial counsel may have known that Beckstead could establish an adequate foundation on both issues if challenged, and he reasonably elected to focus his attention elsewhere. *See Harrington v. Richter,* —— U.S. ——, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011). Christensen has not pointed to any evidence in the record that contradicts this possibility, and we must presume that counsel had a legitimate reason for his choices where a plausible explanation for his choices can be posited. *See State v. Litherland,* 2000 UT 76, ¶ 17, 12 P.3d 92. Accordingly, we cannot say that Christensen's attorney performed deficiently by failing to object to the estimate. And because Beckstead's managerial responsibilities were so broad—including general maintenance throughout the property—allowing the jury to consider the estimate was not plain error. *See Dunn,* 850 P.2d at 1208 (noting that an error must "have been obvious to the trial court" to sustain a claim of plain error).

## II. Prosecutorial Misconduct

¶ 24 Christensen also argues that the "prosecutor committed harmful misconduct" by (1) bolstering "the credibility of a witness that [the prosecutor] agreed was not

credible," (2) "argu[ing] matters not in evidence," and (3) "improperly suggest[ing] that the State does not prosecute people who are innocent." To prevail on a prosecutorial misconduct claim, a defendant must show that (1) "the actions or remarks of ... counsel call to the attention of the jury a matter it would not be justified in considering" and (2) absent the prosecutor's misconduct, "there is a reasonable likelihood that ... there would have been a more favorable result." *State v. King,* 2010 UT App 396, ¶ 21, 248 P.3d 984 (first omission in original) (citation and internal quotation marks omitted).[4] Christensen acknowledges that this claim is unpreserved, but he argues that the prosecutor's statements were so improper that trial counsel provided ineffective assistance by failing to object and that the trial court committed plain error when it elected not to intervene sua sponte. We conclude that none of the three statements at issue constitutes prosecutorial misconduct.

### A. Bolstering

¶ 25 Christensen first contends that the prosecutor inappropriately bolstered the credibility of a witness whose testimony undermined Christensen's alibi. During Christensen's initial meeting with investigators, he claimed that he was visiting Friend in Lehi at the time of the burglary. Police called Friend to check on Christensen's story. She stated that Christensen woke her up sometime between 2:30 and 3:30 a.m. on the date in question and stayed for ten minutes before leaving in a white truck. Five months later in a face-to-face interview, however, Friend admitted that she had lied previously and told a detective that Christensen "never, ever stopped by the house." At the time of that interview, she claimed Christensen had asked her to lie to police, but when questioned at

court committed an error, "it was far from obvious").

4. The parties disagree about who has the burden to show prejudice and how high the standard is in these circumstances. Christensen argues that "[o]nce prosecutorial misconduct is established, the burden shifts to the State to prove the error was harmless beyond a reasonable doubt." The State maintains that "[t]he harmless-beyond-a-reasonable-doubt standard applies only to prosecutorial comments that touch on certain constitutional rights, such as the right against self-incrimination." We have recently acknowledged ambiguities in the case law on this point, *see, e.g., State v. Wright,* 2013 UT App 142, ¶ 41 n. 6, 304 P.3d 887, but because we determine that no misconduct occurred here, prejudice is not at issue.

trial, she testified that a mutual friend asked her to fabricate the alibi. "[T]he only reasonable conclusion one can draw from [Friend]'s statements," Christensen argues, "is that she is a liar." But the prosecutor told the jury during his closing argument that Friend "understands the seriousness of committing perjury, testifying falsely in a court of law," and she therefore "has no reason to lie" at trial. This statement, Christensen maintains, "improperly bolstered the State's case while conveying that Christensen lied about his alibi."

¶ 26 "It is true that a prosecutor engages in misconduct when he or she expresses a personal opinion or asserts personal knowledge of facts." *State v. Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799. But no rule prohibits prosecutors from drawing "permissible deductions from the evidence and mak[ing] assertions about what the jury may reasonably conclude from those deductions." *Id.* In fact, we accord counsel "for each side ... considerable latitude" to "discuss fully his or her viewpoint of the evidence and the deductions arising therefrom." *State v. Dunn*, 850 P.2d 1201, 1223 (Utah 1993). For example, in *State v. Cummins*, this court rejected a prosecutorial misconduct claim where the prosecutor told the jury that a witness had no motive to lie, described the witness's story as "the best that they could remember," and characterized the witness's testimony as "what [the witness] honestly remembered happening." 839 P.2d 848, 854 n. 14 (Utah Ct.App.1992). We noted that these statements "were no more than reasonable inferences based upon the demeanor of the witness and the fact that, before testifying, the witness was required to take an oath of honesty." *Id.* at 854.

¶ 27 Here also, the prosecutor's assertion that Friend had "no reason to lie" was a reasonable inference from the evidence, even if it was not the only one. At trial, Friend acknowledged that she had lied to police in interviews before trial, but she insisted that her trial testimony was truthful because she understood the consequences of "giving a false statement under oath" and lying to investigators. She also explained that when investigators interviewed her in person to confirm Christensen's alibi, she "found out it was more than just something that was going to be brushed under the rug" and she "didn't want to have to lie about it." The prosecutor highlighted those statements in his closing argument and told the jury they supported Friend's credibility:

> [Friend] talked about how she understands the seriousness of lying to police[,] ... which she has testified she did.

> She understands the seriousness of committing perjury, testifying falsely in a court of law. [Friend] has no reason to lie. She doesn't get anything from this except potentially subjecting herself to maybe obstruction of justice or potentially perjury. There is no reason for her to lie.

¶ 28 Christensen, of course, viewed the evidence differently, and his trial counsel argued that the jury had no reason to believe Friend, highlighting a prior forgery conviction and numerous inconsistencies in her testimony and her statements to police. In rebuttal, the prosecutor reiterated that despite the inconsistencies, Friend "was constant ... about [the] bottom line when she came forward in April.... [W]hen push came to shove and she was going to have to appear in court, she was going to tell the truth, and she testified about that today. She has no reason to lie."

¶ 29 Considered in the context of Friend's testimony as a whole, the prosecutor's statements were not improper; the prosecutor did not state his personal beliefs or improperly call the jury's attention to facts not in evidence. Each statement about Friend's credibility was a reasonable inference from her own account of why she lied to police initially and what prompted her to come clean before trial. *See Bakalov*, 1999 UT 45, ¶ 57, 979 P.2d 799 (rejecting a prosecutorial misconduct claim because the prosecutor merely argued "what the jury should infer from the evidence during their deliberations" without stating his personal beliefs). Consequently, any objection to these statements would have been futile, *see State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546, and there was no obvious error that required the court to intervene, *see Dunn*, 850 P.2d at 1208–09.

## B. Facts Not in Evidence

¶ 30 Christensen next asserts that the prosecutor "urged jurors to consider matters not in evidence." The statements he finds troubling occurred when the prosecutor addressed Christensen's theory that Beckstead himself may have staged the burglary but that investigators were "lazy" and failed to realize that Beckstead was a potential suspect. Christensen's trial counsel pointed out that Beckstead failed to lock up the cash and checks in WWC's safe, knew surveillance cameras were not working the night of the burglary, was aware financial data had not been backed up for weeks, and had "access to all of the financials, all of the cash, the safe and the business." Despite these facts, Christensen's attorney argued, police "did not investigate Mr. Beckstead" and they were dismissive at trial when asked why he was never a suspect. In response, the prosecutor argued that if Beckstead wanted to steal from his employer, he had options far more lucrative than staging a burglary:

> If Brian Beckstead's going to steal from Wasatch Wing & Clay, he is going to do it through embezzlement.
>
> He is going to take some here, here a little, there a little, skim it, or he's just going to simply explain to the owners in one of his reports that they had a down week, or a down weekend and he is going to pocket thousands and thousands of dollars.
>
> There is absolutely no need for him to stage some burglary and ... jeopardize his job over $6500 worth of property and then some damage to it. That's—that's speculation.

Christensen argues that these statements were improper because "[t]here was no evidence that it would have been easier for Beckstead to embezzle from his employer rather than" exploit his managerial position by "staging [a] burglary."

¶ 31 As we have discussed, prosecutors may draw "permissible deductions from the evidence and make assertions about what the jury may reasonably conclude from those deductions," see State v. Bakalov, 1999 UT 45, ¶ 57, 979 P.2d 799, but they cannot make any assertions "based on facts not admitted in evidence," State v. Davis, 2013 UT App 228, ¶ 19, 311 P.3d 538. The prosecutor here did not cross the line. First, Beckstead's testimony established that he had extensive access to all of WWC's financial records. Not only did he manage WWC's finances, Beckstead was also in charge of periodically backing up the company's financial information on an external hard drive he kept at his home. Beckstead made deposits for the company, prepared monthly financial reports for its owners, and he knew November was the company's busiest month. And at trial, when the prosecutor asked a detective involved in the investigation whether he could "think of a simpler way" than burglary for Beckstead to "have stolen from the business," the detective answered, "Yes." The prosecutor highlighted all of this evidence in his closing argument and asserted that Beckstead's extensive managerial responsibilities presented a much more attractive opportunity for theft than staging a petty burglary:

> We know [Beckstead] controlled the books, he took the money in, he—he made the expenditures, he would take the money personally from the clients, you know, he was in control of the entire establishment essentially, and then he reported to the owners.
>
> This was during the very busiest season of the year, he talked about tens of thousands of dollars that's being made. If Brian Beckstead's going to steal from Wasatch Wing & Clay, he is going to do it through embezzlement.

¶ 32 These statements were consistent with the trial testimony or amounted to inferences from facts in evidence. See Bakalov, 1999 UT 45, ¶ 59, 979 P.2d 799 (noting that prosecutors "may fully discuss with the jury reasonable inferences and deductions drawn from the evidence"). Christensen may be correct that there was no direct testimony that Beckstead could have exploited his position to embezzle funds from the company. But the detective's opinion that Beckstead had an easier way to steal from WWC besides staging a burglary and Beckstead's own testimony about his extensive managerial responsibilities, along with the implication that he was not carefully supervised, supported a

reasonable inference that embezzlement might be both less risky and more lucrative than stealing some cash and property and disguising it as a burglary.

¶ 33 Moreover, the jurors were specifically instructed that "lawyers['] statements and arguments are not evidence" and that "[i]n reaching a verdict," they should only consider "exhibits admitted into evidence," witness testimony, and "reasonable inferences from that evidence." Without circumstances suggesting otherwise, "courts presume that the jury follows such instructions." *State v. Campos*, 2013 UT App 213, ¶ 62, 309 P.3d 1160 (citation and internal quotation marks omitted). And we see no reason why the jury would have mistaken the prosecutor's closing argument for factual evidence. Consequently, trial counsel did not perform deficiently for failing to raise a likely futile objection, *see Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546, and the trial court did not commit plain error by failing to intervene, *see Dunn*, 850 P.2d at 1208–09.

C. The Prosecutor's Comment that the State Has No Interest in Convicting the Innocent

¶ 34 Christensen also argues that the prosecutor improperly "told the jury that the 'State has no interest in convicting anyone that's innocent.'" This statement, he asserts, "conveyed to the jury the State's belief that Christensen was guilty, suggesting that if he was not guilty, he would not have been subject to prosecution." And he maintains that "[h]ad counsel objected to the prosecutor's statement and requested a curative instruction," "there is a reasonable probability that the outcome would have been different."

¶ 35 Because prosecutors represent the State in criminal proceedings, they carry "a special aura of legitimacy about [them]," infusing their opinions with "the imprimatur of the Government." *Cargle v. Mullin*, 317 F.3d 1196, 1218 (10th Cir.2003) (citations and internal quotation marks omitted). Thus, whenever a prosecutor expresses a personal opinion on any issue-especially the defendant's guilt—there is a serious risk of conveying "the impression that evidence not presented to the jury, but known to the pros-

ecutor, supports the charges against the defendant," jeopardizing "the defendant's right to be tried solely on the basis of the evidence presented to the jury." *State v. Davis*, 2013 UT App 228, ¶ 102, 311 P.3d 538 (citation and internal quotation marks omitted). Here, the State concedes that "[t]aken in isolation, the prosecutor's comment may have had this effect." "But when viewed in context," the State argues, "the comment was not intended to, nor did it have the effect of, . . . expressing an exploitive personal opinion in the form of unsworn testimony." (Citations and internal quotation marks omitted.) While we agree with Christensen that the statement appears troubling in isolation, we also agree with the State that it was not misconduct when considered in the full context of the prosecutor's closing argument.

¶ 36 When reviewing a prosecutorial misconduct claim, we do not consider the propriety or prejudicial effect of each statement in a vacuum. Rather, a prosecutor's statements during closing argument are best understood "in context of the arguments advanced by both sides as well as in context of all the evidence." *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799. For example, in *State v. Redcap*, we rejected a defendant's claim that the prosecutor had "characterized the defense witnesses as zoo animals who lived in cages and were governed by zoo rules and called them convicts and criminals who should be sent to an island to have at each other because they get what they deserve." 2014 UT App 10, ¶¶ 45, 49, 318 P.3d 1202 (internal quotation marks omitted). We noted that "[r]ead in context, the prosecutor's comments did not advocate . . . sending [the defendant] or his witnesses to an island to 'get what they deserve.'" *Id.* ¶ 47. Rather, "[t]he prosecutor was in fact making the opposite point: that [the defendant] and the other inmates should not be left to fend for themselves in a lawless prison environment, but rather that life in prison, like life outside of it, must be governed by rules." *Id.*

¶ 37 Christensen relies on *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir.2003), for the proposition that "it is always improper to suggest a defendant is guilty merely because he's being prosecuted." However valid that

principle may be in general, the context of the prosecutor's statements show he made no such suggestion. Rather, he was emphasizing the State's high burden of proof in criminal cases, not offering a personal opinion about Christensen's guilt or innocence:

> I'm just about to conclude ... my closing argument here, and I'll have a chance to speak again, because the State, we carry the burden of proof.

> It's a burden of proof that we welcome. We understand that it's proof beyond a reasonable doubt. The State has no interest in convicting anyone that's innocent. So the proof must be—it must be beyond a reasonable doubt.

¶ 38 Contrasting these remarks with the statements at issue in *Cargle* is instructive. In that case, the prosecutor told the jury that "all we want is justice.... [W]hat in the world have I or [assistant district attorney] Mrs. Smith or the D.A.'s Office or the police department got to gain by even trying to convict an innocent person? It would destroy our credibility.... We don't do those things." *Id.* at 1218 (first omission and alterations in original) (citation and internal quotation marks omitted). The Tenth Circuit recognized "the universal denunciation of this type of argument" and held that the comments inappropriately "invoked [the State's] own professional expertise and the official imprimatur of the State to influence the jury's assessment of the evidence." *Id.* at 1218, 1221.

¶ 39 Here, by contrast, the prosecutor never argued that the State only prosecutes people who are guilty or that his office would have never brought charges unless Christensen had in fact robbed the clubhouse. Rather, he reminded the jury that, as a matter of public policy, the criminal justice system requires proof beyond a reasonable doubt to avoid convicting the innocent. Far from invoking state authority to improperly influence the jury's evaluation of the evidence, the prosecutor embraced this high burden of proof and explained to the jury why it should be so difficult to meet. This observation is far from controversial. *See, e.g., Schlup v. Delo,* 513 U.S. 298, 325, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("Indeed, concern about

the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system."); *In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) ("I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."); *State v. Sullivan,* 6 Utah 2d 110, 307 P.2d 212, 215 (1957) ("The presumption of innocence and the requirement of proof beyond any reasonable doubt, are indeed of the utmost importance as safeguards against the possibility of convicting the innocent."). Accordingly, even though more careful wording would have been preferable, the prosecutor's efforts to articulate the State's heavy burden of proof in Christensen's case did not amount to misconduct. We therefore conclude that any objection would have been unavailing, so Christensen's trial counsel was not deficient for failing to raise one, *see State v. Kelley,* 2000 UT 41, ¶ 26, 1 P.3d 546, and that there was no obvious error for the trial court to correct on its own accord, *see State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993).

### III. Cumulative Error

¶ 40 Finally, Christensen argues that when the prejudicial effects of each of the errors he identifies "are viewed cumulatively," they "undermine confidence in the verdict." "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had." *State v. Kohl,* 2000 UT 35, ¶ 25, 999 P.2d 7 (omission in original) (citation and internal quotation marks omitted). But if there are no errors committed by the court or trial counsel, we do not apply the cumulative error doctrine. *See id.* Having rejected all of Christensen's claims of plain error and determined that his trial counsel's performance was not deficient, we conclude that the cumulative error doctrine does not apply in this case.

### CONCLUSION

¶ 41 We conclude that Beckstead's estimates of the value of WWC's damaged and

stolen property adequately support Christensen's convictions for second degree felony theft and third degree felony criminal mischief. Consequently, it was not plain error for the jury to consider the estimates, nor was failing to challenge them deficient performance. We also conclude that the prosecutor did not draw the jury's attention to facts not in evidence or improperly offer a personal opinion about the credibility of a State witness or the Defendant's innocence. We therefore reject Christensen's claims of plain error and ineffective assistance of counsel.

¶ 42 Accordingly, we affirm.